## UNITED STATES BANKRUPTCY COURT
## FOR THE
## WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RONALD B. STONE | ) | CASE NO.  06-33601(1)(11) |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| RONALD B. STONE | ) | |
| | ) | |
| Plaintiff(s) | ) | AP NO. 07-3579 |
| | ) | |
| v. | ) | |
| | ) | |
| BRUCE D. ATHERTON | ) | |
| RANDALL SCOTT WALDMAN | ) | |
| RW, LTD., CO. | ) | |
| STONE MACHINE AND | ) | |
| FABRICATION, LLC | ) | |
| | ) | |
| Defendant(s) | ) | |

## <u>MEMORANDUM-OPINION</u>

This matter came before the Court for trial on the First Amended Complaint of the Plaintiff, Ronald B. Stone ("Stone") against Defendants Bruce D. Atherton ("Atherton"), Randall Waldman ("Waldman"), RW, Ltd., Co. ("RW"), Integrity Manufacturing, LLC ("Integrity")[1] and Stone Machine and Fabrication, LLC ("SMF") and the Counterclaim of Waldman, RW and SMF against Stone.  The Court considered the testimony of the witnesses at trial, the documentary evidence submitted and the entire record in this case.  The Court will enter the attached Judgment in favor of Stone on the First Amended Complaint and against the Defendants.  Judgment will also be entered

---

[1]On September 11, 2009, Integrity filed a Voluntary Petition seeking relief under Chapter 7 of the United States Bankruptcy Code.  This Memorandum-Opinion does not address claims against Integrity which are stayed pursuant to 11 U.S.C. §362.

in favor of Stone on the Defendants' Counterclaim. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

Stone started Stone, Tool and Machine ("STM"), a tool and machine fabrication business, in August of 1989 in the Bluegrass Industrial Park in Eastern Jefferson County, Kentucky. His business partner in the venture was Dr. James Greene who held 49% of the stock in STM while Stone held 51%. Dr. Greene supplied the start up capital to purchase land, build a building located at 2400 Ampere Drive, and buy equipment and machinery. Stone supplied the sweat equity and assumed 100% of responsibility for the day to day operations of STM. Things went well and STM grew steadily. The company expanded the building to meet increasing employment and business opportunities. STM was never flush with cash, however, and needed loans periodically for capital improvements and items necessary to build the business and service its customers. That need was satisfied by a series of loans from Fifth Third Bank secured by mortgages and liens on STM's business assets as well as a second mortgage on the Stones' home in Jefferson County.

Admittedly, Stone was not the best businessman. His heart was always in the right place and he devoted his entire energy and enthusiasm to building the business. In 2004, STM lost General Electric, one of it's biggest customers, reducing reliable income. At some point, Stone recognized that it cost him $1.25 to make $1.00 from operations such that he was unable to keep his full complement of employees while paying payroll taxes due the Internal Revenue Service. He chose full employment over paying payroll taxes. This cash flow problem accelerated and accompanied other business contractions which began in 2003. By 2004 a federal tax lien was lodged on the

2

business assets, as well as the Stones' home.  STM began to delay payments to Fifth Third Bank also.  Realizing that STM was getting into financial trouble, Stone consulted his accountant and was referred to attorney Bruce Atherton.

In the Spring of 2004, STM owed Fifth Third Bank approximately $1,000,000 on a series of loans.  Despite these loans, STM had business assets exceeding $1,700,000 in value.  While disputed by Waldman at trial, the Court finds that STM had value or equity above and beyond the debt to Fifth Third Bank.  The real estate at 2400 Ampere Drive was worth $700,000, the machinery and equipment were worth $874,330, accounts receivable totaled at least $125,000 and inventory was valued at $60,000.  What STM had is common in small manufacturing concerns, *i.e.*, cash flow management issues.

Atherton met with Stone and recognized this cash flow issue and that the business had equity.  STM employed Atherton to represent it in a lawsuit filed by Fifth Third Bank on the defaulted loans in Jefferson Circuit Court.  Atherton and Stone met with IRS representatives and negotiated a payment plan for the unpaid withholding taxes.  STM and Stone were unable to make these payments and defaulted on this agreement shortly after it was negotiated.  Atherton was also hired to help STM find new capital for its operations and pay off the Fifth Third Bank obligations.

Atherton had two capital leads for STM to explore.  The first referral was to Waldman, a Louisville native who reportedly had great business expertise and large amounts of capital to invest. The second lead was a business known as Mid America Capital Financial Group ("Mid America") of which Atherton was the CEO and one of three members.  Atherton had STM and Stone sign a

waiver regarding the conflict presented by Atherton's legal representation of STM and his ownership interest in Mid America.

At this time, both Waldman and Atherton claim to have never met in person, having only met by phone regarding another of Atherton's clients in need of cash. Despite their testimony, the overwhelming weight of the evidence points to a much more entrenched and dependent relationship between the two men before Stone first employed Atherton.

What is clear from the evidence, but not disclosed to Stone or STM, is that Atherton and Waldman had a debtor-creditor relationship. For instance, in September 2004, Mid America had an immediate need for $40,000 cash and Waldman loaned the money to Mid America, acquiring personal guarantees of the three members of Mid America. This 90 day loan carried an initial percentage rate of 100 percent and dramatic penalty interest annualized at 1,216 percent if not paid in three day increments, with a maximum recovery from each guarantor of $85,000 or a total of $255,000 from all three men including Atherton.

Mid America defaulted on the note to Waldman when due in December 2004. By 2006, Atherton had made payments on his guarantee totaling $54,000, with Waldman forgiving the remaining balance due because he felt Atherton had paid enough. Waldman sued at least one of the other guarantors for the full balance of their obligation.

Further, at about this same time, Waldman loaned $20,000 to a secretary in Atherton's office to buy a BMW automobile. No lien was recorded on the BMW for Waldman's benefit, but when the secretary defaulted on payment, Waldman had two of his associates repossess the vehicle. Atherton later repaid the defaulted $20,000 loan to Waldman claiming he felt a moral obligation to do so. This repayment proved difficult for Atherton and at least one of his numerous payments on

4

the debt was returned by Atherton's bank marked "insufficient funds." This transaction demonstrates the extraordinary nature of Waldman and Atherton's relationship. Atherton had no legal obligation to pay Waldman on the debt which apparently involved no documentation whatsoever. Waldman utilized the repossession services of two men he boastfully referred to Atherton's employees as his "leg breakers." When confronted with questions about these transactions plus the underlying May 2005 transaction at issue in this case, Waldman depicted himself as a passive recipient of the extraordinary gratuitous behavior of Atherton and later Stone. Given all of the evidence presented, the Court finds Waldman's actions were quite to the contrary.

The Court finds the unconventional nature of these transactions demonstrates a complex financial relationship between Atherton and Waldman that neither of them were loquacious about at trial. The evidence showed Atherton owed Waldman money and was under pressure to pay it back. When Atherton accepted Stone and STM as clients and then led them to both Waldman and Mid America for financial assistance, Atherton had an actual conflict of interest. This conflict was kept secret from Stone and exploited by both Defendants.

Christie Jones, a former secretary of Atherton who was employed at his office during the conclusion of the auto loan transaction, testified by deposition that during her employment in 2004 and 2005, Waldman largely financed Atherton's law office operations. Waldman was one of the few clients Atherton deigned to talk to by phone or would see upon one of his frequent visits to the office. Ample evidence was submitted outlining Atherton's financial dependence on Waldman during this time period and it is clear to the Court there was financial incentive to both men in the acquisition of STM and its assets.

Further background on the depth of the relationship between Waldman and Atherton is the failed Premier Fitness expansion at Fourth Street Live, a business development in downtown Louisville. Atherton introduced his client, Premier Fitness, to Waldman in its attempt to open a new business location at Fourth Street Live, a venture widely followed in the local media. This brief, public episode ultimately disintegrated into bitter conflict among its owners, Waldman and the lender. Of importance to this case is that Atherton introduced Waldman to his client as a "white knight." Atherton testified that Waldman wanted Atherton to bring him new business opportunities.

The introduction of Waldman to Stone fell in line with Waldman's instructions to Atherton. Without Stone's authority, Atherton provided STM's proprietary business data to Waldman before Stone was ever introduced to him. When they did meet, Waldman led Stone to believe that his help was the answer to STM's problems. Waldman boasted about his extensive business successes and great wealth. Stone testified he felt he and Waldman became as close as brothers and then business partners.

Waldman cultivated a lofty and beneficent image of himself to Stone. At trial, the Court was able to observe Waldman's personality and notes that he frequently referred to his past business accomplishments in grandiose terms. For example, he testified that at one job he was responsible for developing "one quarter of a billion dollars in business," a reference which speaks for itself. Atherton's introduction coupled with Waldman's propensity for self-aggrandizement and apparent wealth fostered Stone's reliance upon him when STM was experiencing its financial crisis.

On August 12, 2004, Atherton filed a Chapter 11 proceeding, Case No. 04-35114, for STM in the United States Bankruptcy Court for the Western District of Kentucky. Atherton had represented himself to Stone and STM as experienced in Chapter 11 reorganizations. He bragged

6

that by using the Bankruptcy Code and the power of the Court, he could negotiate with all of STM's creditors and give the company time to acquire new capital, refinance with Fifth Third Bank or do a sale of assets pursuant to Section 363 of Title 11.  A review of the Court's official docket for the case, the schedules and statement of affairs and other pleadings demonstrates that the handling of the case was anything but expert.

Foreshadowing the neglect to follow, the STM Petition itself erroneously reflected the name "Stone Machine & Tool, Inc."  From the date of the filing of the Petition forward, the inaccuracies and defalcations in the STM case multiplied.  A review of what motions were or were not filed in the case, plus the Orders entered by the Court, demonstrate absolute neglect of STM's case by Atherton who accepted a $10,000 retainer and did no apparent constructive work for his client.

Atherton's neglect of STM is punctuated by the Motion to Dismiss the bankruptcy he filed. Paraphrased, Atherton states that given stay relief afforded Fifth Third Bank, a sale of its security interests to a third party and that third party's intent to foreclose on STM's assets, there were no assets to reorganize.  What Atherton did not disclose to the Court or his client or the other creditors of the estate, was that he was not really working for STM or Stone during the bankruptcy proceeding; he was actually employed by Waldman and the new companies he incorporated for Waldman.  While Atherton was bankruptcy counsel for STM, he orchestrated the dissipation of estate assets to another client for no consideration to the bankruptcy estate, without notice to the creditors or Court approval, while such approval was required.

In December 2004, Atherton negotiated a deal with Fifth Third Bank for STM resulting in an agreement for the use of cash collateral during the bankruptcy.  This deal was never tendered to the Court for approval, possibly because Fifth Third Bank had received, unopposed by Atherton, an

7

Order terminating the automatic stay on November 3, 2004.  Stone made one $13,500 payment to Fifth Third Bank on their agreement, only for Atherton to scream at Stone for doing so and forbidding him to make any more payments.  Atherton explained that non-payment was a negotiating tool and that this was the way "the big boys do it."  Stone obeyed Atherton and did not make any more payments to the bank, which, predictably, ultimately resulted in Fifth Third Bank finishing the foreclosure action in State Court.  By March 2005, Fifth Third Bank obtained judgment against the Stones in the amount of $1,052,781.80.  Fifth Third Bank also obtained judgment against STM in the amount of $998,782.13.  Fifth Third Bank requested the appointment of a receiver to undertake possession of STM's assets and collection of its judgments through a sale of assets.

Until Fifth Third Bank held a judicial sale of STM's assets or the STM assets had been abandoned by the bankruptcy estate, STM still had an opportunity to sell its own assets through Bankruptcy Court.  The Court was prompting Atherton for a Plan of Reorganization and Disclosure Statement.  Instead of responding to the Court, Atherton had his office busy with the incorporation of Waldman's new entities, namely RW. Ltd,. Co. and Stone, Tool and Fabrication, Inc. later changed to Stone, Machine and Fabrication, Inc.  In a peculiar turn of events and documentation, these entities ultimately took assignment of the Fifth Third Bank loan and security documents and judgments in May 2005.

By mid-March 2005, Waldman began to spend long hours at STM in Bluegrass Industrial Park taking a position of apparent authority.  He also invited Conner Williams, an associate, into the business to assist both him and Stone.  Waldman began talking directly to Terry Werneke of Fifth Third Bank about paying off or buying the STM debt to Fifth Third.  Waldman had Stone, on behalf of STM, write him two checks for $10,000 cash that Waldman used as part of the consideration to

8

buy additional time from Fifth Third Bank for the purchase of the debt.  Atherton wrote a letter to Thomas Duddy, the state court receiver, to suggest a deal wherein Waldman would purchase the STM assets and the mortgage on the Stones' home through a Section 363 sale in the bankruptcy action.  That deal was rejected by Duddy.  Further negotiations with Fifth Third Bank and the receiver yielded a deal for Waldman.  In that deal, the bank accepted $900,000 ($20,000 of which came from STM) from Waldman, RW and SMF for purchase of the debt.  Meanwhile, Waldman and Stone were negotiating as to what would happen after the sale.

Waldman and Stone agreed that Stone would stay on as president of the new SMF and he would continue to run the business under an employment contract for approximately $82,000 a year for 5 years, acquire 40% of the ownership of the successor entity (vastly discounting the 100% he held in STM), have all Fifth Third Bank debt paid off, including the Line of Credit (business related) mortgage on his home, all STM tax debt paid off on his home and all credit card indebtedness owed by Stone paid off (as it was never disputed all funds were used for the business).  Waldman would get 60% ownership of SMF which amounted to absolute corporate control, his requirement in all of his business deals.

Atherton claimed he did not negotiate or document the deal because of his conflict.  He also claimed he left all negotiations up to the two men.  Stone testified he thought Atherton was representing him and looking after his interests because he had been paid to do so and led Stone to believe he was still representing him.  The Court found Atherton's testimony on his involvement in the negotiation and documentation of the final transaction and his disclosures to Stone to be totally without credibility.  It is clear from the overwhelming weight of the evidence that Stone, unsophisticated in legal matters, did not understand the scheme being planned for STM.  Stone

clearly recognized that STM had equity in its assets but accessing that equity required an experienced lawyer and a financial backer; both promised to him by Atherton and Waldman.

The evidence of the events leading up to, during and after the closing of the purchase of the Fifth Third Bank documents and judgments on May 20, 2005 overwhelmingly point to deliberate deception by Atherton and Waldman. Waldman's oft-used agent, Rick Rutledge ("Rutledge"), acted as a loan broker for the transaction. Rutledge believed Waldman was going to acquire the assets of STM and provide Bullitt County Bank (now known as "PBI") with a first mortgage lien and chattel lien on all assets. PBI, lending on Waldman's history as a good bank customer, believed it was providing financing for Waldman to purchase the assets and that it would acquire a mortgage on assets he, or one of his entities, was buying at closing.

Stone believed Atherton was having him sign documents for the agreement that had been negotiated with Waldman. Atherton did not advise him of what in fact was being transacted and the Stones were hurried to the closing by a cell-phone call from Atherton in which he told them they had to be at his downtown office in 15 minutes. Once at the closing, the Stones were told by Atherton that they must sign the documents and could not take the time to read them. Many documents were tendered by Atherton to the Stones and they signed all of these as instructed. The Court finds the Stones were actively discouraged from reading any of the documents, except the waiver of conflict tendered by Atherton to protect himself, and hurried into signing, so Atherton could "get the documents to the Courthouse before it closed."

Meanwhile, unbeknownst to the Stones, Atherton was busy on behalf of Waldman. Simultaneously with the May 20, 2005 closing, Waldman, RW and SMF were purchasing the Fifth Third Bank loan and State Court judgment documents in the room across the hall from where the

10

Stone/STM closing took place.  The documents assigning Fifth Third's documents to Waldman's entities were not recorded until the following Monday since PBI disbursed the closing funds to Atherton's escrow account, leaving a time lapse for clearance of funds through his escrow account before Fifth Third Bank could be paid.

The May 20, 2005 STM/Waldman closing was nonconforming to commercial standards in many respects.  No Closing Statement was prepared and distributed, PBI did not attend and the attorney employed to prepare the title policy for PBI, Joe Di'Ambrosia, did not attend (although Atherton paid him $4,500 from the closing funds and no final title policy was ever written). Atherton denied preparing any of the documents, suggesting they were all brought to the closing by Rutlege, except the Waiver of Conflict he prepared.  In fact, Atherton's scrivener's certificate appears in many places, he was the only attorney at the closing, it took place in his office and Rutlege testified he did not bring any documents to the closing.

Many of the documents admitted into evidence  indicate that Waldman through RW and SMF was borrowing approximately $1,000,000 from PBI and would be the owner of the assets purchased, granting PBI a first mortgage lien, implying all bank debt would be paid off.  In fact, documentation of part of this transaction was executed and recorded, for a while.  Significantly, however, the other executed and recorded documentation indicated Waldman, through RW and SMF, was actually buying from Fifth Third Bank and then pledging to PBI the mortgages and judgments purchased, plus a first mortgage on the real estate contiguous to 2400 Ampere Drive, purchased from Gene Holloway at closing.  The Holloway property was purchased by RW at closing for $185,000, the source of which was the PBI loan.

11

Again, Atherton and Waldman were not helpful at trial on why the "last minute change" occurred. The import of the change and the surviving recorded transaction was that Waldman, through RW and SMF, would own or control over $1,000,000 in debt against STM, receive title to the real estate of STM directly from STM and Stone, all of the personal property of STM, 100% of the ownership of SMF and a second mortgage lien against the home of the Stones; surety for full cooperation.

Atherton was quite strident in his testimony about his advice to Stone and his understanding of what was happening. This testimony is unbelievable. If Atherton had told Stone that the deal negotiated was dead and that Waldman would own the Fifth Third Bank debt, all of the stock in SMF, the STM line of credit mortgage on the Stones' home, with the tax lien still upon it and all credit card indebtedness outstanding, Stone testified he would not have signed anything that day. Had Atherton applied the most basic ethical analysis to this transaction and its participants and considered the impact of this transaction on his clients, STM and the Stones, he should not have allowed them to sign anything. To allow the transaction to close as it did was an absolute breach of his fiduciary duty to his clients and this Court. And Atherton prepared the documents of the transaction.

The closing of the transaction eviscerated the business of STM while the Bankruptcy Court still had jurisdiction over the assets of the estate. The Bankruptcy Court had jurisdiction over Atherton and it would have sanctioned these defalcations if any of this transaction had been properly disclosed. Atherton's failure on all of these fronts is stunning. The only credible explanation is the existing but undisclosed debtor-creditor relationship between Waldman and Atherton.

12

The May 20, 2005 closing was concluded with Waldman assuring the Stones that everything would be fine and they could now begin a new business venture together, as partners, with Waldman bringing in reams of new business. Waldman announced to the entire STM workforce, in celebration, that he and Stone were now partners in business. The Stones and the Waldmans celebrated the holidays in 2005 at a local restaurant, preferring that "bonus" to the owners rather than a cash bonus as was provided to mere employees.

The Stones did not know what happened at the closing and were lulled into complacency during the post closing period, except that Stone persisted in requesting copies of the documents signed at the table which Atherton promised but did not provide. After the closing, Atherton never again accepted Stone's phone calls. Ultimately, Stone acquired the documents from Atherton's secretary, Christie Jones, who surreptitiously had the documents delivered to Stone. This delivery was months later and Stone did not understand their importance. Notwithstanding Atherton's avoidance, Stone still felt Atherton was his lawyer and Waldman his friend and business partner.

At trial, Waldman argued that he could have purchased the Fifth Third Bank loan documents and judgments without any assistance from Stone or Atherton. This is an interesting and deceptive half-truth. While Waldman could have, he would not have known about STM without Atherton's desire to bring Waldman a better "deal" than the Premier failure. Through Atherton's dependence upon Waldman, Waldman was invited to view proprietary STM financials, introduced to Stone as the trustworthy financial backer the business needed and quite literally given the keys to the business, which had equity, during its Chapter 11 Bankruptcy. Stone had transferred to Waldman and his companies with Atherton's encouragement and insistence, title to the real estate of STM and possession of the core business assets, without receiving any payment or written commitment for

future payment, 40% of the ownership of the new company, an employment agreement and more. Most significant is Waldman's control over the Fifth Third mortgage on the Stones' home. Waldman did not have the expertise to run a tool and machinist shop. He needed Stone's cooperation to keep the business a going concern to preserve the value of the real and personal assets and good will. Waldman also benefitted from this clandestine purchase because it deprived the estate of STM of competitive bidding for the valuable assets, giving Waldman an opportunity to buy them at far less than their market value.

Waldman claimed the STM business (later transferred to Integrity, another Waldman-controlled entity, now in Chapter 7 Bankruptcy) and its assets were worth far less than the evidence tendered by Stone suggesting STM was essentially shutting down. Stagnant cash flow did not mean STM lacked significant inherent value. Closing the business down might have impaired the value but it did not close before the May 2005 transaction. The Court finds the evidence strongly supports the finding of significant equity in STM, which provided Waldman the financial incentive to incur approximately $1,000,000 in debt for its acquisition.

Atherton owed a fiduciary duty to STM, Stone, the estate, its creditors and the Court. During his handling of this matter, Atherton represented Waldman, the intended purchaser for the assets. He not only failed to do anything productive for STM, he permitted the failure of a Cash Collateral Agreement with Fifth Third Bank, failed to respond to Fifth Third Bank's Motion to Terminate the Automatic Stay, failed to propose a Plan and Disclosure Statement, failed to inform the Bankruptcy Court that Waldman, his client, was in charge of STM beginning March 2005 forward and ultimately bought the assets and then finally moved the Bankruptcy Court to dismiss the action. He glibly advised the Court that Fifth Third Bank had received stay relief, had sold its security interest and

14

documents and STM had no assets to reorganize. This amounts to fraud on the United States Bankruptcy Court and demands action by the Court.

As if those latent breaches were not enough, after purchasing the Fifth Third Bank documents and judgments, Atherton entered an appearance in the State Court action on behalf of Waldman and his new entities, which now held all of the Fifth Third Bank debt against STM in the name of RW and SMF. Yet, he never withdrew from representing Stone in the State Court Action. Thus, Atherton was on record as representing both the plaintiff and the defendant in the same case. He then sought a judicial sale of the real estate while he still represented Stone and STM, the defendants. Atherton ultimately saw to it that the judicial sale was accomplished, with RW credit bidding $650,000 for 2400 Ampere Drive (which it already held title to), and he prepared the Commissioner's Deed himself. Nevertheless, he could not find the time to return Stone's phone calls. Atherton denied that he continued to represent Waldman and his entities after the closing in May 2005, but like most of his other testimony, the statement is not believable. His continued representation of Waldman is amply supported by the record.

At no point did Atherton advise the Bankruptcy Court that he had ceased to represent STM and started to represent Waldman. Atherton never pursued the Section 363 sale of assets he referenced in his offer to Mr. Duddy, and during trial it was suggested that this course of action was abandoned when Waldman learned that other parties might bid on the STM assets. Further, Waldman testified that there were as many as six competing bidders at the State Court Commissioner's sale. As Waldman credit bid a portion of the Fifth Third Bank debt he had purchased, he was not paying any funds to the Master Commissioner on the sale. Given six bidders

15

at the sale, it is obvious that STM, Stone and the estate of STM and its creditors were harmed by the failure to pursue bankruptcy remedies.

Stone continued normal business operations oblivious to the events taking place in State Court. He later learned while trying to refinance his home that the tax lien was still in place and Waldman held the Fifth Third Bank mortgage as well. He believed, like PBI and Rutlege, that the tax lien and old Fifth Third Bank mortgages were paid off at closing, and that PBI held a first mortgage lien on the Ampere property. Sly promises of help from Waldman for many months continued and Stone was somewhat complacent given time consuming business issues.

The "honeymoon" period of the new business continued for over a year, with Waldman mollifying Stone and Stone trying to please Waldman, but with pressure of failed business opportunities mounting. It was not until October 2006 that the honeymoon came to an abrupt end when Waldman hired J.C. Harris as the new president for SMF. It was not until then that Stone understood what the transaction had really accomplished *i.e.*, a gutting of the STM equity via transfer to Waldman and his entities through the purchase of the Fifth Third Bank debt leaving Stone with nothing. Much testimony was submitted about Stone's dramatic finish at SMF involving a broken window, airborne objects and an alleged slap to the back of Waldman's head. The Court observes that every party involved in this case (with the exception of Mrs. Stone who was not present) is quite literally physically imposing. Given his history with the machinist and tool manufacturing operation, Stone's reaction to being replaced as president without any advance warning from Waldman was ungraceful but did not result in injury to anyone. It would, however, justify termination of his employment.

16

While there was an extended period of time between closing and this October 2006 argument, the Court notes that Stone is a man of action and at times bullheaded. His behavior during this period is entirely consistent with a tradesman, lacking in strong business detail acumen, too busy to do much but build this new venture. He is also a man of limited understanding of manipulation. Waldman on the other hand according to his own testimony is quite sophisticated having worked for many companies building impressive accomplishments and portfolios everywhere he lighted. The Court accepts that Waldman is as sophisticated as his testimony indicates. Waldman always had a greater understanding of Stone than vice versa.

Stone left SMF at the end of October 2006 for good. At this time, Stone still did not have an employment contract, no stock shares in SMF, had credit card bills in his name, a tax lien against his home and a Fifth Third Bank mortgage from the business line of credit, but now owned by Waldman, on his home. By this time, the balance owed on the debt was over $1,000,000 and Waldman and his companies proceeded to try to collect it from Stone.

## CONCLUSIONS OF LAW

Stone's First Amended Complaint sets forth 14 claims against the Defendants. The claims against Defendant Atherton are for negligence, breach of fiduciary duty and fraud. The Amended Complaint also includes claims against Defendants Waldman, RW and SMF for fraud. The facts as outlined above and proven by the evidence submitted at trial warrant entry of a Judgment in favor of Plaintiff on the following claims against the Defendants. The Court will consider those claims against the Defendants and the Counterclaim of the Defendants against Stone.

A.  <u>Negligence/Legal Malpractice</u>.

In order to succeed on his claim of legal malpractice or negligence in Kentucky, Stone had to prove: (1) that there was an employment relationship with the defendant/attorney; (2) that the attorney neglected his duty to exercise ordinary care of a reasonably competent attorney acting in the same or similar circumstances; and (3) that the attorney's negligence was the proximate cause of damage to the client.  <u>Marrs v. Kelly</u>, 95 S.W.3d 856, 860 (Ky. 2003).  Stone had to show that he would have fared better in the underlying claim, that is, but for Atherton's negligence, Stone would have been more likely successful.  <u>Id.</u>

There is no dispute that there was an employment relationship between Stone and Atherton.  That relationship, of course, gave rise to a duty of care on the part of Atherton to Stone.  The Court must next decide whether Atherton neglected his duty to act as a reasonably competent attorney.  Kentucky courts have considered the standard of care where the claim involves a conflict of interest.  <u>See</u>, <u>Conrad Chevrolet, Inc. v. Rood</u>, 862 S.W.2d 312 (Ky. 1993).  The evidence presented at trial clearly established that Atherton breached his duty of care by a direct conflict of interest.

Supreme Court Rule 3.130(1.7)(a) mandates that a lawyer shall not represent a client if the representation of that client will be directly adverse to another client.  Even a non-lawyer would realize that one could not fairly represent both sides in a lawsuit.  Atherton's representation of Stone in the State Court Action while simultaneously representing Waldman as the opposite party in the same lawsuit constitutes a direct conflict.

Furthermore, Atherton violated SCR 3.130(1.7)(b) which provides that a lawyer "shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, . . ."

Atherton, while representing Stone and Waldman in the sale of Stone's business, was, at the same time, in a debtor/creditor relationship with Waldman in which he owed Waldman amounts in excess of $40,000. It is hard for this Court to even imagine a situation with a more evident, direct and actual conflict for any lawyer. Few scenarios are fraught with more conflict than the one Atherton knowingly placed himself in with Waldman and Stone. The evidence clearly showed that but for Atherton's total neglect of his responsibility to Stone, Stone would have fared better in his negotiations with Waldman and Fifth Third Bank concerning the sale of his business and working out his debts.

Atherton claims Stone's malpractice claim is barred by KRS 413.245 which provides that an action for professional malpractice "shall be brought within one year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been discovered by the party injured." Atherton contends that Stone had knowledge that there were problems with the deal well before he filed suit on December 7, 2007.

The Kentucky professional malpractice statute, KRS 413.245, actually provides two different limitations: one year from the date of the "occurrence" and one year from the date of the actual or constructive discovery of the cause of action. Michels v. Sklavos, 869 S.W.2d 728, 730 (Ky. 1994). The "occurrence" period begins to run upon the accrual of the cause of action. The "discovery" period begins to run when the cause of action was discovered, or, in the exercise of reasonable diligence, should have been discovered. Queensway Financial Holdings, Ltd. v. Cotton & Allen, P.S.C., 237 S.W.3d 141 (Ky. 2007). Mere knowledge of some element of a tort claim is insufficient to begin running the limitations period. Id.

Atherton contends that Stone knew of any alleged malpractice claim at the closing in May of 2005 at the earliest and October 2006 at the latest when he left the employment of Waldman. Plaintiff filed suit on December 7, 2007 and Atherton contends that the claim was barred by this time. Stone, however says he did not discover the malpractice until after the lawsuit was filed and during the course of discovery in the lawsuit.

Stone asserted a claim for negligence in providing legal services against Atherton in his initial Complaint filed December 7, 2007. Additional claims against Atherton, Waldman and Waldman's companies were asserted in the First Amended Complaint filed in September of 2008. These claims form the basis of the malpractice claim based on an actual conflict of interest. These claims were not discovered until extensive discovery had taken place in this lawsuit. Under the discovery rule, such claims were timely raised and not barred by the one year statute of limitations of KRS 413.245.

## B. Breach of Fiduciary Duty by Atherton and Waldman.

Stone asserts a claim that Atherton and Waldman breached fiduciary duties they owed to him. A fiduciary relationship exists "where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Clayton, Jr. v. Heartland Resources, Inc., 2009 WL 790175 (W.D. Ky. 2009), quoting Sec. Trust Co. v. Wilson, 307 Ky. 152, 210 S.W.2d 336 (1948). Kentucky courts have held that a fiduciary duty is owed to one in a confidential relationship and by those in positions of trust. Steelvest, Inc. v. Service Center, Inc., 807 S.W.2d 476, 485 (Ky. 1991). Attorneys, such as Atherton clearly owe their clients a fiduciary duty. Daugherty v. Runner, 581 S.W.2d 12 (Ky. Ct. App. 1978). There is no dispute that Atherton, as Stone's attorney, owed him a fiduciary duty.

20

The record is replete with instances where Atherton breached his fiduciary duty to Stone. He failed to tell Stone that he gave Waldman, a party interested in purchasing Stone's company's assets, his financial documents on the business without Stone's authority. He failed to disclose his financial entanglements with Waldman, failed to adequately explain Waldman's deal to purchase the assets of STM and failed to give him a copy of the closing documents or adequate time to review those documents at the closing. All of these facts caused great damage to Stone.

Atherton's attempt to have Stone waive any conflict of interest at the closing was ineffective. In a case remarkably similar to the one at bar, a written agreement waiving any conflict was presented as part of the closing documents by the attorney representing both the seller and buyer, without consultation, in a transaction. The court stated it was possible evidence of overreaching and ineffective. See, Conrad Chevrolet, Inc. v. Rood, 862 S.W.2d 312 (Ky. 1983). Under the circumstances of this case, the written waiver presented by Atherton was ineffective and similarly had no validity.

Once the purchase was complete, Stone believed he had a 40% ownership interest in the new business. Indeed, Waldman made an announcement to that effect that he and Stone were partners in the new business. Under Kentucky law, a partner has a fiduciary duty to the other partners and requires utter good faith or honesty, loyalty or obedience, as well as candor, due care and fair dealing. There is no relation of trust or confidence known to law that requires a higher degree of good faith. Lach v. Man O'War, LLC, 256 S.W.3d 563 (Ky. 2008).

The course of conduct between the parties established a partnership between Stone and Waldman. This conduct was also part of the fraud perpetrated upon Stone. Under Kentucky law, a partnership can be created by oral communications, written communications, verbal

21

communications and a result of the conduct of the parties. No particular form of contract is necessary to create a valid partnership. <u>Stewart v. Stovall</u>, 191 Ky. 508, 230 S.W. 929, 932 (1921). Waldman's conduct and verbal statements, however, evidenced that partnership. Waldman announced the formation of the partnership to the employees of STM. Under these circumstances, Waldman owed a fiduciary duty to Stone, a duty he blatantly breached by forcing Stone, as an owner and partner, out of the business completely. Stone relied on Waldman to help rebuild the company he had formed. Instead, Waldman acted in his own self-interest, all to Stone's detriment. Stone carried his burden of proof on this claim.

Waldman makes much of the fact that Stone did not list a partnership interest in his bankruptcy schedules. According to Waldman, Stone is judicially estopped from claiming such an interest in this case. The doctrine, however, does not apply to the facts at bar.

The doctrine of judicial estoppel prevents a party from adopting inconsistent legal positions in the same or related judicial proceedings. <u>See</u>, generally, 1B J. Moore, J. Lucas, & T. Currier, <u>Moore's Federal Practice</u> ¶0.405 [8] at p. 111-54 to 56 (2d ed. 1984). The policy considerations underlying the doctrine are to protect the judicial process from abuse. Because judicial proceedings are designed to seek truth, an earlier position that can be explained as unadvised or the product of honest error generally will not preclude a party from later establishing the true state of facts. Absent proof of clear fraud, the assertion of a legal conclusion or opinion generally will not result in preclusion. <u>Lampl v. Smith</u>, 169 B.R. 432 (D. Colo. 1994).

Judicial estoppel is an equitable doctrine to be invoked by a court at its discretion. There are no inflexible pre-requisites or exhaustive formulas for determining its applicability. <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001). Many courts, including the Sixth Circuit, have held the

doctrine inapplicable in cases of conduct amounting to nothing more than a mistake or inadvertence and the absence of bad faith. <u>Browning v. Levy</u>, 283 F.3d 761, 775 (6th Cir. 2002). <u>Eubanks v. CBSK Financial Group, Inc.</u>, 385 F.3d 894 (6th Cir. 2004).

This case does not present a situation where the debtor attempted to actively conceal an asset. There is no motive on the part of Stone to conceal his claim to a partnership interest in STM. At the time he filed bankruptcy, he had a lawyer different from Atherton. The Court is convinced there is no bad faith in Stone's failure to list the claim on his Schedules. Furthermore, there was certainly no prejudice to the Defendants by failing to assert that claim and Stone was entitled to develop the proof to support that claim in this lawsuit. Accordingly, the doctrine of judicial estoppel does not prevent Stone's partnership claim.

### C.  <u>Fraud by Atherton, Waldman, RW and SMF.</u>

Stone's next claim is one for fraud against Atherton, Waldman, RW and SMF. These claims were based on the false representations made to Stone to induce him to enter into the asset purchase transaction with Waldman and his companies for STM. In order to succeed on this claim, Stone had to prove the following by clear and convincing evidence: (1) a material misrepresentation; (2) which is false; (3) that is known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted in reliance thereon; and (6) causing injury. <u>Denzik v. Denzik</u>, 197 S.W.3d 108 (Ky. 2006), citing <u>United Parcel Service Co. v. Rickert</u>, 996 S.W.2d 464 (Ky. 1999). Proof of fraud may be developed by the character of the testimony, the coherency of the entire case, as well as the documents, circumstances and facts presented. <u>Id.</u>

Waldman, RW, SMF and Atherton misrepresented the terms of the deal to Stone. Waldman, RW and SMF promised Stone he would remain a 40% owner of the business, he would payoff his

tax liens, his mortgage, credit card debt and discharge the debt to Fifth Third Bank. Atherton refused to allow Stone to read the documents at the closing, and Waldman assured Stone at the closing that his problems were over. Atherton, in furtherance of the fraud, repeatedly failed to even provide Stone with a copy of the closing documents. Stone relied on Atherton, RW, SMF and Waldman's representations to his detriment. Few cases have been presented to this Court with stronger evidence of fraud by clear and convincing evidence.

### D. Civil Conspiracy, Waldman and Atherton.

Kentucky recognizes a cause of action for the tort of civil conspiracy, which is a separate tort from fraud under Kentucky law. Fastenal Co. v. Crawford, 609 F. Supp.2d 650 (E.D. Ky. 2009). To prevail on this claim, Stone had to prove that Waldman and Atherton entered into an agreement to commit an unlawful act. Id. There must be some overt act done in furtherance of the conspiracy. Id. One Kentucky court has stated,

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and that his own conduct separately considered, constitutes a breach of duty to the third person.

James v. Wilson, 95 S.W.3d 875, 896 (Ky. App. 2002).

Atherton and Waldman could not have accomplished their goal of defrauding Stone out of the assets of STM, unless they had agreed to work together. Their actions at the closing were concerted and accomplished their unlawful actions. The civil conspiracy was complete at the closing on May 20, 2005. Stone proved that Atherton and Waldman conspired to defraud him of his assets causing him damage.

24

E. Breach of Contract and Unjust Enrichment of Waldman, RW and SMF.

The agreement entered into between Waldman, RW, SMF and Stone for purchase of the assets of STM included Stone retaining a 40% ownership in the business. This agreement, however, was breached by Waldman, RW and SMF at the closing. Instead of retaining a 40% ownership interest, by fraudulently inducing Stone to sign the closing documents, Waldman and his companies received 100% ownership of the successor business, SMF, and Stone received nothing. Waldman was unjustly enriched by $879,330, by gaining 100% ownership of the business. This represents the difference between what he paid Fifth Third Bank to acquire the debt, $880,000[2] and the equity in the tangible assets of STM, $1,759,330.

F. Promissory Estoppel, Waldman, RW and SMF.

Stone asserts a claim against Waldman, RW and SMF for damages based on promissory estoppel. The elements of promissory estoppel are as follows: (1) a promise, usually oral; (2) the promissor reasonably expects to induce action or inaction; (3) the promissee reasonably relies upon the promise as evidenced by either an act or a forbearance; and (4) justice can only be achieved by enforcement of the oral promise. Meade Const. Co., Inc. v. Mansfield Commercial Elec., Inc., 579 S.W.2d 105, 106 (Ky. 1979); Bergman v. Baptist Healthcare System, Inc., 344 F. Supp. 2d 998, 1003 (W. D. Ky. 2004). Waldman, RW and SMF contend that all of Stone's fraud claims fail and that his claims are contrary to the written contract. Specifically, the preliminary offer signed by Stone is contrary to any alleged oral contract between Waldman and Stone.

---

[2]Waldman paid Fifth Third a total of $900,000 but $20,000 of that amount came from STM in two checks of $10,000 each.

When an individual is induced to enter into a contract in reliance upon false representations, the person may maintain an action for a recission of the contract, or may affirm the contract and maintain an action for damages suffered on account of the fraud and deceit.  Radioshack Corp. v. ComSmart, Inc., 222 S.W.3d 256 (Ky. App. 2007).  Since such a misrepresentation sounds in tort rather than contract, the parole evidence rule does not apply.  Bryant v. Troutman, 287 S.W.2d 918, 920 (1956). The lack of writing does not prohibit the claim.   The evidence of the oral contract between Waldman and Stone was overwhelming.  The only way injustice can be achieved in this case is to enforce the oral contract between Waldman and Stone.  This contract provided that Waldman, RW and SMF would pay off Stone's debt to Fifth Third Bank, that they would discharge the state court judgment, lien and second mortgage on Stone's residence, that they would satisfy all credit card debt of Stone accrued in the business, that they would satisfy the federal tax lien against Stone and that they would continue his employment at the successor company and retain a 40% ownership in that company. In exchange, Waldman would get what he demanded in all of his deals - control by gaining 60% ownership interest in the new business, which included all of the equity in the business, a very significant asset at closing.   Stone received none of the benefits of the Defendants' oral promises.

The value of the business and intangible items such as control and good will that Waldman gained and Stone lost due to Waldman's breach of promise is difficult to quantify.  The Court does not have the benefit of the result of  a §363 sale with numerous active bidders, or even a contemporaneous appraisal. The Defendants' actions prevented a determination of this value.  The Court will assess such damages in accordance with the proof presented at trial.

26

G. <u>Fraudulent Conveyance</u>.

Waldman's carefully orchestrated scheme ultimately resulted in the assets of STM being transferred to the new entity SMF, of which Stone was to be a 40% owner. Later, Waldman had SMF's assets transferred to Integrity, further insulating the assets from any claim by Stone or STM creditors. The evidence clearly supports a finding that these transfers were done for the purpose of defrauding creditors. Stone and Waldman testified that Atherton made it clear that a new entity had to be created to put it beyond reach of STM's creditors. Atherton provided Waldman continuing legal services to dissuade old STM creditors from pursuing the assets held first by SMF then Integrity. As such, the transfer is void under KRS 378.010.

H. <u>Piercing the Corporate Veil</u>.

Stone seeks to hold Waldman's companies, RW, and SMF liable under the instrumentality theory of piercing the corporate veil. In order to prevail on this theory, Stone had to prove that the corporation was a mere instrumentality of the shareholder, that the shareholder exercised control over the corporation in such a way as to defraud or harm the plaintiff, and that refusal to disregard the corporate entity would subject the plaintiff to unjust loss. <u>White v. Winchester Land Development Corp.</u>, 584 S.W.2d 56, 61 (Ky. App. 1979).

Waldman clearly used RW, SMF and finally Integrity as mere instruments in order to defraud Stone and STM. The assets of STM were transferred from Stone to Waldman's companies by design to defraud Stone and STM creditors. The evidence at trial established that Waldman controlled these entities, disregarded their corporate form all to the detriment of Stone and STM.

## I. Compensatory Damages.

Stone established that he is entitled to recover those damages he suffered as a result of Waldman, RW, SMF and Atherton's fraud and deceit. In Kentucky, the "fundamental rule in assessing damages for fraud is that the victim of fraud is entitled to compensation for every wrong which was the natural and proximate result of the fraud." Sanders v. Chesmotel Lodge, Inc., 300 S.W.2d 239, 241 (Ky. App. 1957); Glock v. Carpenter, 184 F. Supp. 829 (E. D. Ky. 1960), aff'd. 286 F.2d 431 (6th Cir. 1961). These damages are as follows: (1) the tax lien that Waldman promised but failed to satisfy was $35,522. It, however, carried a 100% penalty for nonpayment, resulting in a total lien of $71,044; (2) The value of the STM assets transferred to Waldman was $879,330 (real estate of $700,000, machinery and equipment of $874,330, inventory of $60,000, accounts receivables of $125,000, less $880,000 paid by Defendants to Fifth Third Bank). Stone was to receive a 40% ownership in the new entity. The only new asset acquired at closing and held by SMF was the Holloway property valued at $185,000 at purchase. The Court finds Stone should be compensated for a 40% interest or $74,000. The Court's reasoning for this assessment is Stone is already receiving damages for the 100% of equity of STM just prior to closing. He was deprived of his 40% interest in SMF but the only additional asset of SMF immediately following closing was the Holloway property acquisition; (3) Waldman also failed to pay Stone's outstanding credit card charges incurred on behalf of the company amounting to approximately $50,000; (4) The second mortgage on Stone's residence was approximately $117,000. The total amount of compensatory damages due Stone based on the Defendants' fraud is $1,191,374. The Court does not award damages to Stone on the employment contract as his termination was justified based on his behavior.

28

Further, the Court has insufficient evidence in order to quantify the going concern value of STM just prior to closing.

### J. <u>Punitive Damages</u>.

Under Kentucky law a breach of fiduciary duty is equivalent to fraud. <u>Steelvest Inc. v. Scansteel Service, Inc.</u>, 807 S.W.2d 476, 487 (Ky. 1991). Punitive damages are available under Kentucky law if a plaintiff proves by clear and convincing evidence that a defendant acted with oppression, fraud or malice. KRS 411.184(1)(b). The Court already found that Waldman and Atherton acted fraudulently and that the evidence presented met the clear and convincing standard of proof. Atherton's violation of the Rules of Professional Conduct along with the evidence of breach of fiduciary duty is sufficient to support an award of punitive damages. <u>Fastenal</u>, 609 F. Supp. 2d at 661 (evidence of trickery or deceit is indicative of reprehensibility supporting award of punitive damages). Atherton's actions were nothing less then reprehensible. The fraudulent and overreaching conduct of Atherton was the type of conduct that undermines public confidence in the entire legal profession. An award of punitive damages is one step within this Court's power to remedy that wrong.

The Court is also compelled to sanction Atherton as an officer of this Court who flagrantly abused his position and knowledge of the bankruptcy system all to the detriment of his client. This Court is charged with policing such misconduct to adequately protect the public. Atherton had adequate notice and opportunity to rebut the claims against him. In fact, he was present during trial, had co-counsel representing him and testified in his own behalf. He failed to rebut any of the claims asserted against him. Accordingly, the Court by separate Order, will permanently disbar Atherton from the practice of law in the United States Bankruptcy Court for the Western District of Kentucky.

While Waldman is not an attorney, he is a sophisticated businessman with extensive experience and success. His fraudulent conduct as evidenced by the record in this case also warrants an award of punitive damages. His planning and conduct in this transaction amount to far more than just "getting a good deal." The Court finds his actions similarly inexcusable and warrants a punitive damage award, joint and severally assessed against the Defendants, in a total amount of $2,000,000, approximately twice the amount of the compensatory damages.

Judgment will be entered in favor of Stone and against the Defendants, jointly and severally, in the amount of $1,191,374 representing compensatory damages and $2,000,000 representing punitive damages.

### K.  Waldman's Counterclaim.

Defendants RW, SMF and Waldman filed a Counterclaim against Stone seeking to collect $506,000 remaining on the state court Judgment and $117,000 representing the lien on Stone's residence. Given the Court's findings herein, the Counterclaim has no merit. The debts that the Defendants seek to collect were procured by their fraudulent activities. Therefore, they are legally unenforceable and Judgment in Stone's favor on the Counterclaim will be entered accordingly.

### CONCLUSION

For all of the above reasons, Judgment is entered in favor of the Plaintiff Ronald Stone on the First Amended Complaint against the Defendants Bruce Atherton, Randall Waldman, RW, Ltd., Co. and Stone Machinery Fabrication, LLC. A Judgment incorporating the findings herein accompanies this Memorandum-Opinion.

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  October 30, 2009

30

**UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**WESTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RONALD B. STONE | ) | CASE NO.  06-33601(1)(11) |
| | ) | |
| _____ Debtor(s) | ) | |
| | ) | |
| RONALD B. STONE | ) | |
| | ) | |
| Plaintiff(s) | ) | AP NO. 07-3579 |
| | ) | |
| v. | ) | |
| | ) | |
| BRUCE D. ATHERTON | ) | |
| RANDALL SCOTT WALDMAN | ) | |
| RW, LTD., CO. | ) | |
| STONE MACHINE AND | ) | |
| FABRICATION, LLC | ) | |
| | ) | |
| _____ Defendant(s) | ) | |

## **JUDGMENT**

   Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

  **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment in favor of Plaintiff Ronald B. Stone, be and hereby is, entered, jointly and severally, against Defendants Bruce Atherton, Randall Waldman, RW, Ltd., Co. and Stone Machine Fabrication, LLC in the amount of $1,191,374 in compensatory damages and $2,000,000 in punitive damages.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Judgment in favor of the Plaintiff and against the Defendants on the Counterclaim is entered and Defendant shall take nothing by way of the Counterclaim seeking to enforce the Fifth Third judgments and liens against Stone and his residence at 9511 Dabney Carr Drive, Louisville, Kentucky 40299.

This is a final and appealable Order.  There is no just reason for delay.

Joan A. Lloyd
United States Bankruptcy Judge

Dated:  October 30, 2009

2

# UNITED STATES BANKRUPTCY COURT
## FOR THE
### WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RONALD B. STONE | ) | CASE NO.  06-33601(1)(11) |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| RONALD B. STONE | ) | |
| | ) | |
| Plaintiff(s) | ) | AP NO. 07-3579 |
| | ) | |
| v. | ) | |
| | ) | |
| BRUCE D. ATHERTON | ) | |
| RANDALL SCOTT WALDMAN | ) | |
| RW, LTD., CO. | ) | |
| STONE MACHINE AND | ) | |
| FABRICATION, LLC | ) | |
| | ) | |
| Defendant(s) | ) | |

## ORDER

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that attorney Bruce D. Atherton is permanently disbarred from the practice of law in the United States Bankruptcy Court for the Western District of Kentucky.

This is a final and appealable Order.  There is no just reason for delay.

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  October 30, 2009